IN THE UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Peoples First Community Bank,

     Plaintiff,

vs.

                            CASE NO. _____

GREG M. BRUDNICKI,
JOSEPH F. CHAPMAN, III,               JURY TRIAL DEMANDED
HENRY CLAYTON FUTRELL,
PHILIP W. GRIFFITTS,
JOHN ROBERT MIDDLEMAS, JR.,
RODNEY C. MORRIS,
RAYMOND E. POWELL,
JOHN STEPHEN WILSON II,

     Defendants.
_____/

## **COMPLAINT**

     Plaintiff, Federal Deposit Insurance Company, as Receiver for Peoples First

Community Bank, sues the Defendants and alleges the following:

### **I. INTRODUCTION**

     1.     On December 18, 2009, the Office of Thrift Supervision ("OTS") closed

Peoples First Community Bank, Panama City, Florida ("Peoples" or the "Bank") and

appointed the FDIC as Receiver for Peoples ("FDIC-R").  The loss to the Deposit

Insurance Fund as a result of the failure of Peoples is currently estimated at $726.3 million.

As set out in 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), the FDIC-R succeeded to all

rights, titles, and privileges of Peoples and its depositors, account holders, other creditors,

and stockholders.  One of the rights the FDIC-R has by statute is the right to pursue claims against the Bank's former directors and officers, including the claims asserted herein against each of the Defendants.

2.      The claims asserted herein are against eight former Peoples directors, one of whom was also an officer, for negligence and gross negligence.   FDIC-R brings this action in its capacity as Receiver for Peoples and seeks compensatory and consequential damages.  The wrongful acts committed by the Defendants were in connection with eleven speculative and high risk commercial real estate ("CRE") transactions, four of which were acquisition, development, and construction ("ADC") transactions, and one of which was a raw land transaction.  The transactions were approved by the Defendants from November 1, 2005, through August 14, 2007 (the "Transactions").   The eleven Transactions are identified in Exhibit "A," which is attached hereto and incorporated herein.

3.      The Defendants failed to use safe and sound banking practices and, on an uninformed basis, approved and allowed irresponsible and unsustainable rapid asset growth concentrated in high-risk transactions, including the eleven Transactions that are the subject of this action, without implementing and adhering to adequate underwriting and credit administration policies and practices to manage the risks.  The Defendants routinely failed to inform themselves adequately of the relevant risks in connection with their approval of credit transactions, failed to prevent violations of the Bank's policies, ignored glaring deficiencies in transaction presentations, and instead, without meaningful deliberation, approved transactions they knew, or should have known, would likely cause substantial losses to the Bank, including the eleven Transactions.

4.      As described in more detail below, there were numerous material deficiencies with respect to the eleven Transactions, each of which required the approval of, and was approved by, the Defendants.  These deficiencies adversely affected the risk to the Bank and included, but were not limited to:  (1) failure to obtain, analyze, and evaluate historical borrower and guarantor financial information required to assess the creditworthiness of the borrower and guarantor as well as their respective ability to service debt and carry the projects; (2) engaging in transactions with borrowers and/or guarantors who had not demonstrated sufficient liquidity to service debt; (3) failure to evaluate collateral and other sources of repayment; (4) failure to adhere to the Bank's loan to value ("LTV") ratio limits; (5) turning a blind eye to glaring deficiencies in transaction presentation information; (6) failure to evaluate properly the underlying real estate, to consider issues raised in appraisals, or to obtain adequate appraisals; and (7) imprudently relying on interest reserves, speculative profits from undeveloped real estate projects, and real estate collateral in a declining real estate market.  In short, the Defendants regularly violated the Bank's policies and prudent banking standards, engaged in numerous wrongful acts and, as a direct and proximate result, caused substantial damages.

## II. JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter as actions in which the FDIC is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et seq.*, 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC has the power to bring suit in any court of law.  12 U.S.C. § 1891.

6.      This Court has personal jurisdiction over the Defendants, who at all relevant times were either residents of, or conducted the business of the Bank in, the State of Florida.

7.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because the claims and causes of action asserted in this Complaint arose and occurred in this district.

### III. THE PARTIES

8.      The FDIC is a corporation organized and existing under the laws of the United States of America, specifically 12 U.S.C. § 1811 *et seq.*, and is an instrumentality of the United States of America charged with, among other duties, the orderly liquidation of failed banks.  12 U.S.C. § 1821(d).  The FDIC brings this action as the Receiver for Peoples.

9.      Defendant Greg M. Brudnicki ("Brudnicki") was a Bank director from May 11, 1993, and Acting Chairman of the Board from January 21, 2009, until the Bank closed. Brudnicki resides in Panama City, Florida.

10.     Defendant Joseph F. Chapman, III, ("Chapman") was the Bank's founder and Chairman of the Board from January 17, 1983, through December 2008.  He remained a director until the Bank closed.  Chapman resides in Panama City, Florida.

11.     Defendant Henry Clayton Futrell ("Futrell") was a Bank director from December 15, 1993, until the Bank closed.  Futrell resides in Lynn Haven, Florida.

12.     Defendant Philip W. Griffitts ("Griffitts") was a Bank director from May 11, 1993, until the Bank closed.  Griffitts resides in Panama City, Florida.

13.     Defendant John Robert Middlemas, Jr. ("Middlemas") was a Bank director from July 2, 2002, until the Bank closed.  Middlemas resides in Panama City, Florida.

14.     Defendant Rodney C. Morris ("Morris") was a Bank director from 1989 until the Bank closed.  Morris resides in Panama City, Florida.

15.     Defendant Raymond E. Powell ("Powell") was Chief Executive Officer ("CEO") and President of the Bank from November 1, 1991, and a director from 1989 until the Bank failed.  Powell resides in Panama City, Florida.

16.     Defendant John Stephen Wilson II ("Wilson") was a Bank director from 1983 until the Bank closed.  Wilson resides in Panama City, Florida.

## IV.   THE DEFENDANTS' DUTIES

17.     Defendant Powell, as President and CEO of the Bank, owed to the Bank, its depositors, account holders, other creditors, and stockholders under Florida law the duty to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Bank; to manage the Bank in a safe and sound matter, to ensure that the Bank's policies were followed, to take reasonably prudent steps to ensure that Peoples did not approve or engage in imprudent business transactions as part of a plan to unreasonably grow the Bank or otherwise.  Powell assumed the duties of an officer of Peoples to act in a reasonably prudent and non-negligent manner, consistent with the standard of care for reasonable bank officers for managing a depository institution.  Powell was required to exercise ordinary care and diligence in approving transactions he had

authority to approve, including the nine Transactions he approved as a member of Peoples'
Board.

18.     All Defendants, as directors of Peoples, owed to the Bank, its depositors,
account holders, other creditors, and stockholders under Florida law the duty to act in good
faith, with the care an ordinarily prudent person in a like position would exercise under
similar circumstances, and in a manner they reasonably believed to be in the best interests
of the Bank; to ensure that the Bank's policies were followed and to take reasonably
prudent steps to ensure that Peoples did not approve or engage in imprudent business
transactions as part of a plan to unreasonably grow the Bank or otherwise; and to exercise
ordinary care and diligence in approving transactions as members of the Bank's Board,
including the eleven Transactions, and in the administration of the affairs of the Bank.

## V.     FACTUAL BACKGROUND

19.     CRE and ADC Transactions are more speculative than other bank
transactions because, among other reasons, of the lack of an inherent cash flow source,
uncertainties of development and in the sales process, and the need for adequate and secure
primary and secondary sources of repayment.  Prudent action in this segment of banking
requires careful underwriting, timely evaluation of and response to economic trends
impacting the industry, and strict adherence to prudent banking policies and standards.

20.     Moreover, concentrating a portfolio in CRE and ADC transactions increases
a bank's aggregate risk for numerous reasons, including: (a) concentration in any sector of
the economy increases risk resulting from that sector's downturn; (b) the housing market,
in particular, is cyclical by nature; (c) the primary source of repayment is cash flow from

the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high real estate development-related CRE and ADC concentrations.

21.     In short, concentrations of such transactions in the volatile commercial real estate market render a bank vulnerable to changes in market conditions and require vigilant adherence to sound lending practices.  It is imperative that the known risks inherent in high CRE and ADC concentrations be managed by, at a minimum, stringent underwriting and adherence to internal credit policy and prudent lending standards, meaningful and informed deliberation, management oversight, strategic planning, risk assessment and monitoring of the transactions, portfolio risk management, management information systems, market analysis, and stress testing.

22.     Peoples opened for business in 1983 as a state-charted bank named Peoples First Financial Savings and Loan Association.  It changed its name to Peoples First Community Bank and converted to a federally chartered savings bank in 1995.  Peoples was a full service bank with primary lines of business including the origination of land, one- to four-family, nonresidential mortgage, and single-family construction transactions in its primary markets in the Florida panhandle, Jacksonville, and Orlando.

23.     Beginning in 2005 and at the direction of the Defendants, Peoples embarked on an aggressive growth strategy resulting in excess concentrations in high-risk CRE and ADC transactions.  However, the Bank did not have adequate risk management practices in place to support its strategy.  The Bank also did not have adequate or well-defined credit policies appropriate for the type and complexity of its lending activity.

24.     From March 31, 2005 to March 31, 2008, Bank assets grew from $1.5 billion to $1.8 billion.   By December 31, 2006, the Bank's land transaction portfolio represented 289 percent of its risk-based capital.   By March 31, 2008, $988 million (54.8 percent) of the Bank's total assets were classified as high-risk non-homogeneous transactions, of which $923 million were construction and development, CRE, and land transactions.

25.     By no later than October 2005, and before approving any of the eleven Transactions, the Defendants were warned by regulators that the Bank's underwriting and transaction administration were deficient, including failures to regularly obtain acceptable appraisals, failures to rely on the "as is" market value of collateral, and failures to ensure accuracy of documentation.   Despite the warnings, similar violations were later made in connection with the eleven Transactions approved by the Defendants that are the subject of this action.

26.     Before approving any of the eleven Transactions, the Defendants knew or should have known that the Bank was over-concentrated in risky CRE transactions as early as 2005.   In 2005 and again in 2006 and 2007, regulators warned that the Bank had high-risk concentrations in real estate transactions well above the average of its peer institutions. In 2006, regulators cautioned that the Bank's risk management was inadequate and required that the Bank adopt a plan to mitigate its exposure to the high concentration in land transactions.   The Defendants ignored the regulators and aggressively pursued increased CRE/ADC transactions, including the eleven Transactions that are the subject of

this action, engaged in unsafe and unsound banking practices, and failed to take corrective measures to diversify the Bank's portfolio.

27.     As the Defendants also knew or should have known, the Bank's asset quality deteriorated and CRE concentrations increased throughout 2006.  By late 2005, the Bank had exceeded its own internal concentration limit on land transactions, which at the time was 22.5 percent of total assets.  Yet the Defendants continued to approve the eleven Transactions, and permitted and approved an increase in CRE concentration levels as the real estate market declined and the Bank's collateral values diminished.  Instead of mitigating risk, in March 2006, the Bank raised its internal limit from to 27 percent of total assets and then quickly exceeded this new limit when land transactions grew to 29 percent of total assets (which was 289 percent of total capital).

28.     Despite the warnings and policy violations, the Defendants continued to aggressively pursue increased CRE/ADC transactions, including the eleven Transactions, and failed to take corrective measures to diversify the Bank's portfolio or enhance underwriting or risk management standards.  Despite warnings, the Defendants continued to engage in unsafe and unsound practices.  Among other issues, the Defendants continued to allow excessive concentrations in CRE and ADC transactions, including by approval of some of the eleven Transactions, violated Interagency Appraisal and Evaluation Guidelines for appropriate appraisals, violated the Interagency Policy Statement on the Allowance for Loan and Lease Losses ("ALLL"), and improperly relied on interest reserves as a source of repayment.

29.     The Defendants increased the Bank's already high risk exposure by: (i) failing to implement and follow sound underwriting and credit administration practices; (ii) failing to implement prudent risk management strategies; (iii) failing to follow the Bank's internal credit policies; (iv) failing to approve the eleven Transactions in an informed and deliberative manner; and (v) taking actions that otherwise negatively impacted the Bank's assets.

30.     The Defendants knew or should have known that the Bank was pursuing risky growth strategies, including in the approval of the eleven Transactions.  They were warned by regulators about the Bank's underwriting deficiencies and increasing concentration in the CRE and ADC area and attendant risks and deficiencies, yet continued to approve such risky transactions, including the eleven Transactions.

31.     In addition to ignoring repeated regulatory warnings, the Defendants knew or should have known of the decline of key economic indicators, such as a slowing of the real estate market, including the slowing of housing sales and peaking of home prices by early 2006, and continued to encourage and approve high risk and speculative transactions, including the eleven Transactions.

32.     Due to the deficient underwriting allowed by the Defendants in approving transactions, including the eleven Transactions referenced in Exhibit A, as well as deficient risk management and poor credit administration, Peoples was fatally exposed to the inevitable cyclical decline in real estate values.  As real estate markets declined, the Bank's financial condition deteriorated and its condition was deemed critical.  Asset quality problems in the Bank's portfolio resulted in material losses that threatened the Bank's

viability.  As a result of the Defendants' failure to address known concerns first raised in 2005 relating to underwriting and risk management, the Bank's classified assets rose to a level that was amount the worst in its peer group.  The Defendants had failed to take necessary and timely actions to improve the Bank's financial condition, and Peoples failed on December 18, 2009.

## VI.   PEOPLES' INTERNAL CREDIT POLICIES AND PRACTICES

33.    During the relevant time period, the Defendants were members of the Bank's Executive Loan Committee ("ELC") and entrusted with responsibility for approving transactions in excess of $750,000.  Each of the eleven Transactions on Exhibit A exceeded $750,000 and required approval of the ELC.  In exercising their approval authority, the Defendants were charged with acting in an informed and deliberative manner in reviewing and analyzing applications and supporting documentation to ensure that transactions were properly documented, underwritten, and otherwise satisfied the Bank's internal credit policies as well as prudent, safe, and sound, banking practices.

34.    Peoples' internal credit policy dated as of December 15, 2004, and as amended on January 18 and May 24, 2006, and on June 20, 2007, governed the approval of the eleven Transactions on Exhibit A.  At all times relevant to this matter, the provisions of the internal credit policy set forth below were in effect and governed the approval of the eleven Transactions.  In conscious disregard for the best interest for the Bank, the Defendants, without being fully informed, and without meaningful deliberation, carelessly and without due care, approved the eleven Transactions before funding and violated, among other things, the following provisions of the Bank's internal credit policy:

- The Bank was to avoid high-risk transactions,

- All decisions were to be preceded by sound credit analysis.

- All transactions required proper documentation defined as sufficient to verify a borrower's ability to repay and to verify the strength of the guarantor.  Such documentation included written applications, current financial statements, credit reports, and tax returns.

- For land transactions, interest reserves were discouraged; borrowers were to support carrying costs.

- All credit decisions were required to be based on a thorough understanding and careful consideration of a borrower's financial condition, ability to pay, and credit history.

- All transactions required a global cash flow or other analysis of a borrower's ability to service all of its debt.

- In commercial credit transactions, borrowers were required to provide "meaningful" equity, defined as a minimum of 10 to 20 percent.

- LTV ratio limits were 65 percent for raw land acquisition transactions, 75 percent for land development transactions, 75 percent for commercial lot transactions, and 80 percent for commercial construction transactions.

- Appraisals were required to be current (less than a year old), in conformance with OTS regulations and the Uniform Standards of Professional Appraisal Practice ("USPAP"), and prepared by a state-certified appraiser selected from a list approved by the Board.

- The concentration of similar credits was not to exceed 25 percent of risk-based capital.

35.     In addition to failing to comply with the internal credit policy in approving the eleven Transactions on Exhibit A, the Defendants failed to comply with applicable banking regulations and safe and sound underwriting practices, including, but not limited to, the general safety and soundness standards of 12 C.F.R. § 364.101, Appendix A, the

general underwriting standards of 12 C.F.R. § 364.101, Appendix A, and the real estate lending standards of 12 C.F.R. § 365.2, Appendix A.

36.     The Defendants' approval of the eleven grossly imprudent Transactions on Exhibit A was devoid of even the slightest degree of care by them as Directors and/or, in the case of Powell, as an officer, and thus demonstrates the Defendants' negligence and gross negligence in performance of their duties.  The Defendants' approval of the eleven Transactions on Exhibit A demonstrates their failure to exercise business judgment.

## VII.  THE ELEVEN TRANSACTIONS

37.     The eleven high-risk Transactions on Exhibit A all contained multiple violations of the Bank's internal credit policy, prudent banking standards, and in some cases, violated banking statutes and regulations, all of which adversely affected the risk profile of Peoples.  Many of the transactions lacked adequate financial information, global cash flow analyses, or other information sufficient to evaluate the ability of borrowers and guarantors to service the debt.

38.     Despite multiple material deficiencies, repeated and obvious violations of the Bank's internal credit policy, prudent banking standards, and in some cases, violations of banking statutes and regulations, each of the Defendants voted to approve at least five of the eleven Transactions prior to funding.  As indicated on Exhibit A, prior to funding, the Defendants approved the following number of the loss Transactions each:  Brudnicki approved eight; Chapman approved ten; Futrell approved eleven; Griffitts approved nine; Middlemas approved eight, Morris approved five, Powell approved nine, and Wilson approved eleven.

13

39.     The manner in which the Defendants approved the eleven Transactions on Exhibit A violated the Bank's internal credit policy.  The only written evaluations of transactions relied upon by the Defendants were terse summary two-page memoranda.  These memoranda, which provided virtually no analysis of a borrower's or guarantor's ability to service debt, were inadequate on their face and inconsistent with the Defendants duty to investigate and make a diligent credit analysis before approving a transaction.

40.     The Defendants could not realistically exercise any degree of reasonable care or business judgment by rubber-stamping an approval after reading a two-page memorandum.

41.     In addition, the Defendants relied almost exclusively on real estate collateral for repayment in a declining real estate market.  The Defendants often ignored the "as is" market value of a collateral property in favor of a higher valuation, which in many cases resulted in illusory compliance with the Bank's LTV limits.  Relying on "as completed" appraised values instead of "as is" values for the Bank's land development loans is grossly negligent in general, and particularly egregious in this case because of: the Defendants' imprudently heavy reliance on real estate collateral in a declining real estate market and economic slow-down; the Defendants' lack of any meaningful analysis of borrowers' and guarantors' ability to repay, carry the subject property, or feasibility of the development; and  Defendants' primary reliance on speculative income from completed development as a source of repayment.

42.     The Defendants' also approved transactions without conducting a pre-approval appraisal review.  Without such appraisal reviews, the Defendants could not

know whether appraisals were accurate, whether appraised values are overstated, or whether appraisals complied with all Bank policy requirements. Such willful blindness as to the contents of an appraisal is grossly negligent, especially in light of the Defendants' imprudent reliance on real estate collateral as a source of repayment.

43.     In addition to other violations, all of the eleven CRE/ADC transactions: were overly dependent on collateral for repayment; included a demonstrable inability of the borrowers or guarantors to service debt or carry the project, or had insufficient documentation or inadequate borrower or guarantor analysis; were approved without adequate analysis of the viability of the proposed projects; and many lacked a sufficient supporting appraisal of collateral and were in violation of the Bank's LTV limitations.

44.     The Defendants' approval of the CRE Transaction with "PQH"[1] (the "PQH Transaction" listed on Exhibit A) is illustrative of the Defendants' abdication of their obligations to comply with the Bank's internal credit policy, to follow safe and sound banking practices, and to act in a deliberative and informed manner.

45.     On November 22, 2005, seven of the Defendants, as members of the ELC, approved a $12.2 million transaction to refinance an existing mortgage with another bank and to provide funds for the development of 239 single-family homes in Polk County, Florida. The transaction included a large $800,000 interest reserve used to make interest-only monthly payments over the 18 month term of the transaction. Prior to approval, the

---

[1]     Borrowers and guarantors are described using initials only in order to preserve their right to financial privacy afforded by applicable state and federal banking laws. Under a protective order, the full names will be provided to Defendants.

Defendants approving the transaction knew that the primary repayment source was to be the speculative sale of to-be-developed homes in the subdivision.

46.     The financial analysis reviewed by the Defendants who approved the PQH Transaction was incomplete and lacked adequate detail, rendering it impossible for them to evaluate current or future global cash flow and preexisting debts of the borrowers and guarantors.  Prior to approval, the Defendants who approved the PQH Transaction knew or should have known that the majority of the borrower's and guarantors' net worth consisted of illiquid assets such as real estate and real estate investments.

47.     In addition, the transaction memorandum reflected that the vacant real estate was collateral had an appraised "as completed" market value of $16.28 million and an "as is" market value of $11.052 million.  The Defendants who approved the PQH Transaction imprudently ignored the "as is" value, which yielded a LTV ratio of 110 percent in violation of Bank policy.

48.     The Defendants approving the PQH Transaction violated the credit policy, and knew or should have known that the proposed transaction included deficiencies, in the following respects.

- The Defendants failed to engage in "sound credit analysis."

- The Defendants failed to evaluate sufficient financial information of the borrowers and guarantors and had no basis to evaluate their liquidity, ability to service the debt, or ability to carry the project.

- Credit reports, tax returns, and financial statements were missing from the Bank file.

- The policy limit for this type of transaction was 75 percent, but as previously noted the LTV ratio based on "as is" value (as required by the Bank policy) was 110 percent.

16

- The Defendants' reliance on the sale of the completed development was imprudent especially in a declining real estate market and where the borrower's ability to service the debt or the strength of the guarantor was questionable.

- The Defendants' reliance on a large interest reserve was imprudent in a declining real estate market and was discouraged by the Bank's policy.

49.     As with the PQH Transaction, each of the other Transactions on Exhibit A violated the Bank's policies and contained deficiencies that were readily identifiable to the Defendants, and of which they knew or should have known, yet the Defendants approved the eleven Transactions despite the deficiencies.

50.     In their review, evaluation, and approval of the eleven Transactions, the Defendants and each of them failed, neglected, or refused to approve the transactions in an informed and deliberate manner.  The Defendants failed to exercise even the slightest care in their review, evaluation and approval of the eleven Transactions, causing substantial damages to the Bank.

51.     In their review, evaluation, and approval of the eleven Transactions on Exhibit A, the Defendants and each of them failed, neglected, or refused to fully and properly discharge their duties and obligations, and failed, neglected, or refused to exercise that degree of diligence, care, and skill which ordinarily prudent persons would exercise under similar circumstances in like positions and in a manner consistent with the best interests of the Bank.

52.     With respect to the eleven Transactions, each of the Defendants caused or permitted some or all of the following acts or omissions, among others:

a.  Failing to act with meaningful deliberation and failing to inform themselves and each other about the true nature and condition of the

Bank's portfolio, and failing adequately to review and inquire into the Bank's transactions;

b. Failing to establish and adhere to policies and procedures that took into account the warnings and criticisms of the Bank by regulatory authorities, including but not limited to approving and/or acquiescing in the imprudent growth of the Bank's CRE/ADC transaction portfolios;

c. Causing or permitting Transactions to be made to borrowers who were or should have been known to be not creditworthy or who demonstrated a lack of ability to repay;

d. Causing or permitting Transactions to be made with inadequate or inaccurate financial information regarding the creditworthiness of the borrower/guarantors and prospective source of repayment;

e. Approving Transactions with inadequate documentation;

f. Causing or permitting Transactions to be made on an unsecured or inadequately secured basis, including but not limited to violations of policies and regulations pertaining to appropriate LTV ratios;

g. Causing or permitting Transactions to take place on the basis of inadequate appraisals;

h. Failing generally to exercise their duties to manage and supervise the affairs of the Bank in a safe, sound, and prudent manner consistent with their duty to act in the best interests of the Bank and to protect the Bank and its stockholders, account holders, and depositors.

53.     In connection with the aforementioned acts and omissions related to their approval of the eleven Transactions, the Defendants, individually and collectively, made uninformed decisions without meaningful deliberation and disregarded to advice of regulators s designed to assist them in their decision-making.

54.     The Defendants' actions and inactions in approving the eleven Transactions displayed such an absence of care in the exercise of their affairs as to constitute negligence and gross negligence in the performance thereof, and constitute abuses of discretion and/or demonstrations of bad faith.

55.     As early as November 1, 2005, when the first of the eleven Transactions was approved, the Defendants knew or should have known of the obvious increased risk to the Bank in pursuing the growth strategy for high-risk CRE/ADC transactions.  The breaches of the duties of care each Defendant owed to the Bank, its depositors, account holders, other creditors, and stockholders proximately caused the damages complained of herein.  In particular, the Defendants' negligent and grossly negligent approvals of the eleven Transactions on Exhibit A caused significant damages.

56.     All conditions precedent to the bringing of this action have been satisfied or waived.

## VIII. CLAIMS FOR RELIEF

### COUNT I
### Ordinary Negligence

57.     FDIC-R realleges and incorporates by reference each of the allegations in paragraphs 1 through 56 of this Complaint as though fully set forth herein.

58.     The Defendants owed the Bank, its depositors, account holders, other creditors, and stockholders a duty of care under § 607.0830(1)(a)-(c), Florida Statutes, and other provisions of Florida law to act in good faith, in a manner they reasonably believed to be in the best interests of the corporation, to exercise the diligence, care, and skill which ordinarily prudent persons would exercise under similar circumstances in like position, including, but not limited to, the following:

> a.  Informing themselves about each of the proposed eleven Transactions and the risks the Transactions posed to the Bank before they approved them;

19

b.  Engaging in meaningful deliberation and exercising independent judgment in connection with the review and approval of the eleven Transactions;

c.  Approving only those Transactions that conformed with the Bank's internal policies;

d.  Confirming that any Transactions the Defendants approved were underwritten in a safe and sound manner;

e.  Ensuring that any Transactions they approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f.  Not approving Transactions that exceeded the Bank's relevant concentration limits without adequate capital and other safeguards in place to mitigate the added risk of loss; and

g.  Ensuring that any Transactions approved did not violate applicable banking rules and regulations.

59.  The Defendants breached these duties of care and were negligent by, among other things:

a.  Failing to inform themselves about the risks that the eleven Transactions that are the subject of this action, posed to the Bank before they approved them;

b.   Failing to engage in meaningful deliberation and exercise independent judgment in connection with the review and approval of the eleven Transactions;

c.   Approving the eleven Transactions, with terms that were contrary to and/or inconsistent with the Bank's internal credit policy;

d.   Failing to confirm that the eleven Transactions, were underwritten in a safe and sound manner;

e.   Failing to ensure that the eleven Transactions, were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank;

f.   Approving Transactions that caused the Bank to exceed the Bank's relevant concentration limits; and

g.   Failing to ensure that the Transactions did not violate applicable banking rules and regulations.

60.   As a direct and proximate result of the Defendants' negligent actions and omissions as described herein, the FDIC-R seeks damages caused thereby, the exact amount to be proven at trial.

61.   With respect to their negligent actions and inactions in approving the eleven Transactions, the Defendants were acting in cooperation and in concert and, therefore, each Defendant is jointly and severally liable for all compensatory and other damages.

## COUNT II
## Gross Negligence Under 12 U.S.C. § 1821(k)

62.     The FDIC-R realleges and incorporates by reference each of the allegations in paragraphs 1 through 56 of this Complaint as though fully set forth herein.

63.     Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  Florida law defines "gross negligence" as the equivalent of slight care or as a course of conduct which a reasonable and prudent person would know would probably result in harm or injury.

64.     The acts and omissions of each of the Defendants, described in this Complaint, including in paragraphs17 through 56 above, demonstrate their failure to exercise the equivalent of slight care or a course of conduct which a reasonable and prudent person would know would probably result in harm or injury.

65.     The Defendants owed to the Bank, its depositors,  account holders, other creditors, and stockholders under Florida law the duty to act in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he reasonably believed to be in the best interests of the Bank; to ensure that the Bank's policies were followed and to take reasonably prudent steps to ensure that Peoples did not engage in imprudent business transactions as part of a plan to unreasonably grow the Bank or otherwise; and to exercise ordinary care and diligence in approving transactions and in the administration of the affairs of the Bank.

66.     In approving the eleven Transactions on Exhibit A, each of which failed to comply with the internal Bank policy and safe and sound banking practices, the Defendants each repeatedly abdicated his duties under Florida law and responsibilities to the Bank by failing to act with slight care, by unreasonably failing to investigate material facts, by not acting in good faith, by not acting in the best interest of the Bank, by approving transactions without being reasonably well informed, and without meaningful deliberation, and by ignoring the danger and risks the Transaction approvals were causing to the Bank.  In so doing, each Defendant exhibited such a lack of slight care or followed a course of conduct which a reasonable and prudent person would know would probably result in harm or injury.

67.     The Defendants' actions and inaction described herein constitute gross negligence under Florida law.

68.     The Defendants also rejected or disregarded the prudent advice of third parties, such as regulators and auditors, designed to assist them in their decision-making with respect to the Bank's internal policies and practices.

69.     The Defendants were aware, or in the exercise of reasonable diligence should have been aware, of significant weaknesses in the Bank's underwriting practices and procedures, including with respect to the eleven Transactions that are the subject of this action.

70.     The Defendants were also aware, or in the exercise of reasonable diligence should have been aware, of the deterioration of the Bank's asset portfolio caused by

imprudent transactions, including the eleven Transactions that are the subject of this action.

71.     The Defendants were also aware, or in the exercise of reasonable diligence should have been aware, of the negative impact on the Bank's earnings, liquidity and capital-to-asset ratio caused by high risk CRE/ADC transactions, including the eleven Transactions that are the subject of this action.

72.     The Defendants were also aware, or in the exercise of reasonable diligence should have been aware, of the deficiencies in underwriting and support exhibited by the eleven Transactions on Exhibit A, yet the Defendants approved the Transactions anyway.

73.     As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, the FDIC-R, as Receiver for Peoples, seeks damages caused thereby, the exact amount to be proven at trial.

74.     With respect to their grossly negligent actions and inactions in approving the eleven Transactions, the Defendants were acting in cooperation and in concert and, therefore, each Defendant is jointly and severally liable for all compensatory and other damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Federal Deposit Insurance Corporation, as Receiver for Peoples First Community Bank, demands a trial by jury and judgment in its favor against the Defendants as follows:

A.     For compensatory and other damages as a result of Defendants' negligence and/or gross negligence, against the Defendants at an amount to be proven at trial;

B.      For prejudgment interest pursuant to Florida law and 12 U.S.C. § 1821(l);

and

C.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issue so triable.

**DATED**: December 17, 2012

Respectfully submitted,

/s/ Joseph G. Galardi
Joseph G. Galardi
Florida Bar No. 180572
BEASELY HAUSER KRAMER
& GALARDI, P.A.
505 South Flagler Drive, Suite 1500
West Palm Beach, Florida 33401
Tel:  (561) 835-0900
Fax: (561) 835-0939
Email: galardi@beasleylaw.net