UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

FEDERAL DEPOSIT INSURANCE
CORPORATION, as Receiver for
Peoples First Community Bank,

      Plaintiff,

vs.

                                        CASE NO.: 5:12-CV-00398-RS-GRJ

GREG M. BRUDNICKI, *et al.*,

      Defendants.

_____/

## FDIC-R'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL

      Plaintiff, Federal Deposit Insurance Corporation ("FDIC-R"), as Receiver for Peoples First Community Bank (the "Bank"), responds to Defendants' Motion to Compel Production of Documents, Strike or Overrule Objections, and for Sanctions [D.E. #15] (the "Motion to Compel").

## I.      INTRODUCTION

      Defendants' document request includes 94 separate and far-reaching requests. In their Motion to Compel, Defendants falsely claim that FDIC-R has refused to produce relevant responsive documents in this case. Defendants omit the fact that, prior to the filing of the Motion, FDIC-R agreed to produce almost every category of document Defendants have requested and that they now claim are at issue in their Motion to Compel. In fact, FDIC-R has agreed to produce or make available for inspection the tens of thousands of pages of relevant key documents in this case without delay, subject only to Defendants' agreement to entry of a standard confidentiality order, which Defendants have unreasonably rejected.

1

Defendants' further claim that FDIC-R is withholding documents inherited from the failed Bank and maintained in electronic format is also incorrect and misleading. FDIC-R is in possession of a massive amount of electronically stored information ("ESI") that it inherited upon the closing of the Bank. Most of this ESI is not relevant to the claims and issues in this case. Therefore, FDIC-R has developed at considerable cost and effort, and proposed for use here, a reasonable method for providing Defendants unfettered access to a more manageable pool of potentially relevant information in an efficient and cost effective manner. Defendants have rejected FDIC-R's proposal and would require FDIC-R to unilaterally incur the effort and costs to review of a massive volume of ESI for marginally relevant documents.

FDIC-R has acted in good faith with respect to discovery. Any delay in the discovery process has been caused by Defendants. Therefore, and because FDIC-R's specific objections to Defendants' requests are well-founded, Defendants' Motion to Compel should be denied.

## II.     FDIC-R's CLAIMS AND THE SCOPE OF RELEVANT DISCOVERY

The eight Defendants are seven former directors of the Bank, along with one former officer/director (Defendant Powell). *See* Am. Compl. [D.E. 17]. FDIC-R has sued Defendant Powell for negligence and all eight Defendants for gross negligence in connection with their approval of eleven speculative and high-risk commercial real estate ("CRE") development loans from November 1, 2005, through August 14, 2007 (collectively the "Transactions").

Defendants failed to adhere to the most basic principles of prudent banking or exercise even the slightest degree of care in approving these Transactions. Defendants approved them: in knowing violation of numerous specified Bank policies, regulatory policies and guidelines, and sound lending practice; to borrowers and guarantors who had a patent and

2

demonstrable inability to repay; with insufficient underwriting, without appraisals, and based on improper valuations.  Defendants also ignored warnings that the Bank's underwriting policies were insufficient to mitigate the risks associated with the speculative Transactions.

Based on these and similar allegations, the information relevant to the claims and potential defenses relate to Defendants' actions in connection with approving the eleven Transactions and the information and warnings they considered or ignored in the process.

**III.   FDIC-R HAS AGREED TO PRODUCE RESPONSIVE AND RELEVANT DOCUMENTS UNDER A REASONABLE PROTOCOL.**

As is clear from FDIC-R's specific responses to Defendants' document requests, FDIC-R has agreed to produce almost all of the documents requested by Defendants, subject to certain overarching and categorical problems with Defendants' requests, which are discussed in more detail below.  *See* Motion to Compel, FDIC-R Responses to Requests 1-3, 5, 7-14, 16-17, 20, 22-23, 25, 27-78, 80-81, 83-94.  Thus, the main dispute raised by Defendants is the manner in which responsive documents should be produced.

After the Bank was closed, FDIC-R collected and processed approximately 2.053 terabytes of electronically stored information ("ESI") from the files of the Bank.  **Exhibit "A,"** Decl. of Ray Rivard ¶ 13.  This includes over 52,000 discrete paper documents which were scanned and converted to ESI.  This ESI also includes over 45 million data records and approximately 1.5 million electronic files.  If printed to paper, the 2.053 terabytes of Bank ESI would fill approximately 67,000 banker boxes with over 150 million pages of paper.  (*Id.*)

Most of this ESI was uploaded to an internal FDIC-R database known as DMS iConnect ("DMS") in anticipation of litigation and to expedite discovery.  (*Id*. ¶¶ 4, 13.)  FDIC-R has already spent $624,000 in connection with collecting and processing Bank files and ESI for use

in discovery.  Therefore, FDIC-R anticipates that ESI from the DMS database will comprise the bulk of document discovery produced by FDIC-R in this case, and that discovery will primarily consist of production by FDIC-R to Defendants.  In recognition of this fact, on February 7, 2013, FDIC-R proposed a "two phase" process for the production of documents to Defendants (the "Protocol").  A copy of the Protocol is attached as Exhibit A to the parties' Joint Scheduling Report [D.E. 6].  *See also* **Exhibit "B"** hereto.

> **A.  FDIC-R has agreed to produce most of the relevant documents in this case in Phase I production to occur immediately.**

In "Phase I" production, FDIC-R *has agreed* to produce the key relevant documents in this case, which include: (1) voluminous credit, underwriting, appraisal and other loan-related files kept by the Bank for the eleven Transactions at issue; (2) Bank loan and appraisal policies; (3) Board and loan committee meeting minutes and packages from the relevant time period; (4) pre-failure loan reviews relating to the eleven Transactions or the Bank's loan portfolio during the relevant time period performed by the Bank or outside auditors; (5)  reports of examination ("RoEs") performed by the Bank's primary regulator, the Office of Thrift Supervision ("OTS") from 2002 forward, and key regulatory correspondence relating to those RoEs that are from the Bank's files in FDIC-R's possession.  *See* Ex. A ¶ 9.[1]

This Phase I production consists of approximately 61,000 pages of documents to be produced to Defendants in text - searchable electronic format.  FDIC-R has agreed to produce the Phase I documents at its own expense.  To the extent possible, FDIC-R intends to produce the Phase I documents in an orderly and organized fashion by category and as maintained in the

---

[1] The terms of the Protocol and the scope of Phase I discovery were addressed by undersigned counsel for FDIC-R in numerous telephone conferences with Defendants' counsel, including most recently on May 3 and May 13, 2013.

ordinary course of business.

Importantly, and subject to limited objections discussed below, FDIC-R has agreed to produce the Phase I documents to Defendants subject to only one condition:  the entry of a confidentiality order.  A confidentiality order is a necessary prerequisite to the production of documents because the documents contain the personal and financial information of Bank customers and regulatory information that is strictly confidential and prohibited from disclosure by state and federal law.  *See* FDIC-R Mot. for Protective Order [D.E. 13].  Defendants rejected FDIC-R's proposed confidentiality order and thereby caused delay in Phase I production.

The Phase I production constitutes the vast majority of the documents that are most relevant to the claims and defenses at issue in this case and are responsive to many of the specific document requests raised in Defendants' Motion to Compel.  However, Defendants failed to make the Court aware of FDIC-R's commitment to make Phase I production, and instead disingenuously argued that FDIC-R has refused to produce documents.  This conduct speaks for itself and belies Defendants' good faith in filing this Motion to Compel, much less their entitlement to sanctions.

> **B.    Defendants' participation in Phase II production, including sharing in some of the costs, is fair and appropriate under the Rules of Civil Procedure.**

In addition to Phase I production, a small subset of the vast ocean of ESI on the DMS database includes documents that are relevant to the claims and defenses in this case and that are responsive to Defendants' document requests.  Such documents include what would be a small subset of emails relating to the Transactions located on the Bank's servers and hard drives collected by FDIC-R.  Under Phase II, Defendants would participate in the process of culling relevant and discoverable documents from the 2.053 terabytes of information on DMS by

supplying FDIC-R with a set of search terms and the names of key Bank employees to be run through DMS.  Defendants are entitled to request additional and refined searches to ensure all relevant information is retrieved from DMS.  *See* Ex.  ¶ 4.  This is entirely appropriate because Defendants ran the Bank for years before it failed.  Accordingly, they are in the best position to know how they stored Bank documents; what they were called; whose names, titles, or other identifying information might appear in the documents; and a myriad of other factual information necessary to locate relevant ESI.

The "hits" from the searches of DMS will result in a filtered and more focused set of potentially relevant information that will be uploaded to a database known as "Relativity." Defendants will have access to Relativity through the internet and enjoy the ability to search, review, and annotate all ESI on Relativity in complete confidence that their work product is secure.  Defendants will have precisely the same search functionality for the uploaded ESI as FDIC-R.  Defendants can then take advantage of this essentially unfettered access to identify the documents they wish to receive and FDIC-R will produce them subject to a privilege review and clawback agreement.  *See* Ex. B ¶¶ 5-8; Ex. A ¶¶ 14, 15.  Importantly, FDIC-R's proposed Protocol minimizes the overall costs to all parties, including Defendants, because there is no need for the parties to incur the cost of hosting multiple ESI review platforms.

This is a case where the burden and expense of discovery is essentially one-sided. FDIC-R is in possession of virtually all documents and materials that are relevant to this litigation and, assuming Defendants did not unlawfully remove documents from the Bank at or prior to failure in electronic or other format, Defendants are likely to have virtually none. Courts have recognized that dramatically asymmetrical discovery obligations weigh in favor of

shifting costs because the lack of reciprocity may undermine the incentives of the relatively

unburdened party to control discovery costs.  Under such circumstances, cost shifting presents

an appropriate tool for realigning incentives to avoid unnecessary expense.  For example, in

*Boeynaems v. LA Fitness, Int'l, LLC*, 285 F.R.D. 331, 334-35 (E.D. Pa. 2012), the court was

faced with a cost-sharing dispute between individual plaintiffs with "very few documents" and a

defendant with "millions of documents and millions of items of . . . ESI." The *Boeynaems* court

recognized that "where the cost of producing documents is very significant, the Court has the

power to allocate the cost of discovery, and doing so is fair." *Id.*

It costs the FDIC-R $450 per gigabyte to upload data to Relativity.  Defendants are not

being asked to share in that cost.  Defendants are being asked only to pay collectively $225 per

gigabyte of data that is uploaded to the Relativity database.   Ex. B ¶ 8.  Based on the use of

similar protocols in similar litigations, the cost to Defendants, collectively, is estimated to be

approximately $200 per month.  *See* Ex. A ¶ 10.

Defendants are also being asked to pay $0.06 per page for *only* the subset of ESI they

ultimately request to be provided from the Relativity database.  Ex. B ¶ 7.  The $0.06 per page

rate is calculated to fairly compensate the FDIC-R for a portion of the costs it incurs in

making and delivering copies of requested ESI. The $0.06 rate incorporates estimates of $0.15

per page for scanning of paper documents; $0.035 per page for optical character recognition

processing of paper documents; $325 per gigabyte to "image" ESI, $0.025 per page to affix

BATES numbers and confidentiality designations to items of ESI; and labor costs ranging

from $35 to $300 an hour for technical time, quality control reviewers, and project managers.

*See* Ex. A ¶¶ 17, 18.

Defendants do not claim that the proposed Protocol is unmanageable or that it is an ineffective way to conduct discovery in this case.  Indeed, the proposed Protocol is being used in over a dozen other similar lawsuits.  *See* Ex. A ¶ 19.  Not only have defendants in multiple failed bank cases agreed to the Protocol without court intervention, where not agreed to, courts in litigations brought by FDIC-R against the former officers and directors of failed banks have approved of the use of a two-phase protocol and the use of the Relativity database.  *See, e.g.*, *FDIC (Rec. for Silver State Bank) v. Johnson, et al.*, No. 2:12-cv-00209-KJD-PAL (D. Nev. Mar. 22, 2013) (hereinafter *"Silver State"*); *FDIC (Rec. for First Sec. Nat'l Bank) v. Baker, et al.*, No. 1:12-cv-04173-RWS (N.D. Ga. Apr. 18, 2013) (**Exhibits "C" and "D,"** respectively).

Defendants' objection is based on its incorrect claim that FDIC-R's Protocol is a cost-shifting measure.  (Mot. to Compel at 3.)  That is not true because FDIC-R has already incurred, and will continue to incur, the majority of costs associated with discovery.  Moreover, the cost sharing proposed by FDIC-R in this case has been held to be reasonable and permissible under the Federal Rules of Civil Procedure.  In *Silver State,* the district court held that a protocol nearly identical to the one proposed here should be adopted and that the defendants should pay $.06 per page of for the production of documents.

The *Silver State* opinion is based on a well-reasoned and correct application of the Rules.  Under Rule 34, it is well-settled that the producing party should not be forced to bear the costs of making copies of responsive materials for the requesting party.  *Lightguard Sys., Inc. v. Spot Devices, Inc.*, 281 F.R.D. 593, 606 (D. Nev. 2012); *see also Simms v. Ctr. for Corr. Health & Policy Studies*, 272 F.R.D. 36, 40 (D.D.C. 2011) (requiring defendant to pay for copying documents responsive to defendant's requests for production).

The costs sought to be shared with Defendants can and should be analogized to copying costs incurred during traditional paper discovery.  *See Silverstate* at 5.  For example, in *In re Aspartame Antitrust Litig.*, the court examined whether certain costs associated with electronic discovery were "fees for exemplification and the costs of making copies of any materials" subject to taxation under 28 U.S.C. § 1920(4).  817 F. Supp. 2d 608, 614 (E.D. Pa. 2011).  The court determined that "the creation of a litigation database, storage of data, imaging hard drives, keyword searches, deduplication, data extraction and processing" were analogous to copying costs and therefore should be taxed under the statute. *Id.*; *see also Service Employees Int'l Union v. Roselli*, 2010 WL 4501276, *3 (N.D. Cal. Nov 1. 2010).  Similarly, in *Race Tires America, Inc. v. Hoosier Racing Tire Corp.*, the Third Circuit found that "the conversion of native files to TIFF" should be considered costs of making copies.  674 F.3d 158, 191 (3d Cir. 2012).  Notably, FDIC-R is *not* requesting that Defendants share the costs of creating and/or storing data in the FDIC-R's litigation database, or of running keyword searches for responsive ESI, which were considered copying costs by the court in *In re Aspartame*.

    **C.**    <u>**Cost-shifting is appropriate under the *Zubulake* framework.**</u>

Fed. R. Civ. P. 26(c) grants this Court broad discretion to protect a party from "undue burden or expense" in complying with discovery requests.  *See also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 358 (1978).  Cost shifting is appropriate when, as here, "demands for production of documents impose identifiable expenses and burdens on the producing party." *In re P.R. Elec. Power Authority*, 687 F.2d 501, 507 (1st Cir. 1982); *see also E.E.O.C. v. Boeing Co.*, No. CV 05-03034-PHX-FJM, 2007 WL 1146446, *3 (D. Ariz. April 18, 2007); *Multitechnology Servs., L.P. v. Verizon*, No. 4:02- CV-702- Y, 2004 WL 1553480, at *1-2

(N.D. Tex. July 12, 2004).  Producing the ESI requested by Defendants would impose undue

burden and costs on FDIC-R, rendering the ESI "not reasonably accessible." *See* Fed. R. Civ. P.

26(b)(2)(B); *see also Rodriguez-Torres v. Government Dev. Bank of Puerto Rico*, 265 F.R.D.

40, 43-44 (D.P.R. 2010) (requested ESI not reasonably accessible where producing that ESI

would cost $35,000.  In light of the costs that FDIC-R has already incurred and will incur to

prepare and produce ESI to Defendants, this Court should find that, absent the proposed

Protocol, the ESI requested by Defendants is not reasonably accessible under Rule 26(b)(2)(B).

Federal courts evaluate seven factors to determine whether cost-shifting is appropriate in

a given case: (1) the extent to which the request is specifically tailored to discover relevant

information; (2) the availability of such information; (3) the total cost of production, compared

to the amount in controversy; (4) the total cost of production compared to the resources

available to each party; (5) the relative ability of each party to control costs and its incentive to

do so; (6) the importance of the issues at stake in the litigation; and (7) the relative benefit to the

parties of obtaining the information.  *See Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284

(S.D.N.Y. 2003).  Cost shifting can be appropriate even if only one factor weighs in its favor.

*See id.* at 289.  The first, fourth, fifth, sixth, and seventh factors all weigh heavily in favor of

ordering Defendants to bear a portion of the production costs in this case.

***The First Factor***:  Defendants have propounded 94 extremely broad discovery requests

seeking "all" documents "that constitute, discuss, or refer to" various categories that are not

properly limited in time, scope or relevance.  Responding to these requests will likely result in

voluminous production of materials only tangentially relevant and/or duplicative of materials

identified by FDIC-R in its Initial Disclosures and to be produced by FDIC-R at its own cost

10

and expense.  Since Defendants have not narrowly tailored their discovery requests, the first

factor weighs heavily in favor of shifting costs.

      **The Fourth Factor**:  Cost-shifting is more appropriate when the requesting party can

easily afford to bear some of the discovery costs.  *See OpenTV*, 219 F.R.D. at 478 (finding that

the fourth factor weighed in favor of cost shifting when the requesting party had "the financial

ability to fund [the] litigation" and the parties were "similarly situated" financially).  Defendants

enjoy considerable resources that may be directed towards sharing the costs of production

through the $11 million insurance policy currently paying their defense costs.  The limited costs

proposed by FDIC-R would constitute but a modest draw on that resource.  Moreover, the costs

that Defendants would be required to share are relatively not significant.  *See supra*.  Again,

FDIC-R is not requesting that Defendants share in all of the substantial costs it has and will

incur in discovery for locating, processing, and hosting ESI requested by Defendants.

      **The Fifth Factor**:  FDIC-R is in possession of virtually all documents and materials that

are relevant to this litigation.  *See supra* at 7.

      **The Sixth Factor**:  This is a "critical consideration" when applicable.  *See Zubulake v.*

*UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003).  This litigation is but one of many

lawsuits brought by the FDIC as the public insurer of the nation's banks against former

directors and officers of a failed bank, and therefore implicates the important public policy of

holding accountable the owners and managers of publicly insured institutions.  In this case,

where a government plaintiff who represents the public interest is involved in dozens of

lawsuits throughout the nation, denying cost-shifting would potentially "deter the filing of

potentially meritorious claims" by FDIC-R against former directors and officers of failed banks.

In other words, because of the unique circumstances present here, this litigation's "potential for broad public impact" weighs heavily in favor of shifting discovery costs. *Id.* at 321.

*The Seventh Factor*:  Because Defendants' discovery requests are so broad, they essentially ask FDIC-R to conduct a fishing expedition of the Bank's ESI, solely at FDIC-R's considerable expense, and solely for Defendants' purported benefit.  In *Zubulake III*, the court noted that "absent an order, [the producing party] would not" undertake the requested electronic discovery production "of its own volition."  *Zubulake*, 216 F.R.D. at 289.  Similarly, FDIC-R would not normally undertake the various tasks (or incur the corresponding costs) associated with making and delivering electronic copies of requested ESI to Defendants.  This seventh factor therefore weighs heavily in favor of shifting costs.

FDIC-R's proposal on ESI is not a "cost-shifting" device.  But even if it is considered as such, cost-shifting is appropriate in this case under the *Zubulake* factors.  Defendants' Motion to Compel the production of documents that are not being produced in Phase I should be denied, and FDIC-R's proposed Protocol should approved by the Court.

## IV.    FDIC-R's OBJECTIONS TO SPECIFIC REQUESTS SHOUD BE SUSTAINED.

As an initial matter, Defendants contend that FDIC-R violated Local Rule 26.2(c)(1), which states that objections should be made to "specific" requests and "may not be made generally."  FDIC-R has not violated the spirit of the Local Rule because its general objections are not being used to hold objections in reserve or leave in doubt what documents FDIC-R intends to withhold.  *See Pulscard, Inc. v. Discover Care Servs., Inc.*, 168 F.R.D. 295, 303 (D. Kans. 1996).  Instead, FDIC-R's general objections serve an efficient purpose, and they make clear why FDIC-R objects to producing certain broad categories of documents

requested by Defendants.  Further, FDIC-R made specific objections to each of the Requests it objected to in whole or in part.

For example, General Objections 1, 13, and 14 inform Defendants that FDIC-R intends to produce documents pursuant to the two-phase protocol discussed above after the entry of a confidentiality order.  General Objection 3 makes clear that FDIC-R will produce documents relating to the pre-closing regulation of the Bank, without waiving its right to object to the admissibility of such documents in support of defenses that cannot apply as a matter of law.  General Objection 5 makes clear that it does not intend to produce documents in the possession of other entities, including the FDIC in its Corporate capacity or the OTS. Stating these objections in response to each of Defendants' 94 requests serves no purpose except to make FDIC-R's discovery response exponentially and unnecessarily longer.[2]

With respect to the specific Requests and objections at issue, Defendants' stated reasons for compelling documents are perfunctory.  In the interests of efficiency, FDIC-R addresses common arguments made by Defendants with respect to certain categories of Requests, why such arguments should be rejected, and why FDIC-R's objections should be sustained.  Failure to address a particular argument raised by Defendants should not be considered a waiver of any objection to a particular Request.

### A. Documents relating to post-receivership administration, disposition, or sale of the loans and collateral are not discoverable.

**Request 2**: All documents that constitute, discuss, or refer to the Transactions, including . . . loan modifications, *loan dispositions, and loss calculations*.

**Request 4**: All documents that constitute, discuss, or refer to any transfer, assignment or

---

[2] Defendants also complain about FDIC-R "repeatedly" stating objections.  Apparently, Defendants' position is that FDIC-R can neither assert universal objections nor repeated objections.  This is a non sequitur that purports to forbid FDIC-R from making any objection at all.

sale of the Transactions.

**Request 5**: All documents that constitute, discuss, or refer to the history of the Transactions to date.

**Request 6**: All documents that constitute, discuss, or refer to any sale or potential sale of the Bank or its assets, any loss-share agreement between the FDIC and Hancock Bank or any other bank relating to the Bank, how the FDIC and Hancock Bank or any other bank agreed to deal with the Transactions at issue, and the post-sale performance of the Bank's assets.

**Request 7**: All documents that constitute, discuss, or refer to any calculation of the damages claimed or claimable by the FDIC against the Defendants.

**Request 21**: All documents that constitute, discuss, or refer to expert and consultant opinions or reports on real estate lending in Florida provided to or obtained by the FDIC *for any period of time between 2002 and 2012*. . . .

**Request 26**: All documents that constitute, discuss, or refer to the sale, assignment, transfer, or other disposition, including but not limited to any foreclosure, collection, or enforcement proceedings, of any loan or other asset of the Bank as to which a loss is claimed, including but not limited to the Transactions at issue.

   To the extent that these Requests concern the history of the Transactions prior to the date the Bank was closed and the FDIC-R was appointed receiver on December 18, 2009, Defendants' motion is moot.  As expressly stated in its responses to these Requests, FDIC-R has agreed to produce such documents from the Bank files that are in FDIC-R's possession, including during Phase I discovery.

   However, all of these Requests, in whole or in part, seek documents relating to how the Transactions and their underlying collateral were managed and disposed of after the Bank was closed.  Although they have not yet answered the Amended Complaint, it appears from these Requests and conversations with Defendants' counsel that Defendants intend to argue that FDIC-R failed to mitigate its damages.  Such information is not relevant because, as a matter of law, FDIC-R has no such duty to mitigate.

Challenges to the discretionary actions of the FDIC as receiver in liquidating financial institutions are legally invalid, and discovery calculated to support those defenses is irrelevant. Congress created the FDIC as receiver to "promot[e] the stability of and confidence in the nation's banking system" *Gunter v. Hutcheson*, 674 F.2d 862, 870 (11th Cir. 1982); not to safeguard the rights of bank directors and shareholders. *FDIC v. Bierman*, 2 F.3d 1424, 1439-40 (7th Cir. 1993) ("when the FDIC acts to replenish the insurance fund through the disposition of assets of the failed bank, including the right of action against the officers and directors, it has no duty first to attempt to mitigate the damages attributed to those individuals.");[3] *FDIC v. Cherry, Bekaert & Holland*, 129 F.R.D. 188, 195-96 (M.D. Fla.1989) ("[S]econd-guessing the efforts of the FDIC in carrying out its duties with respect to marshaling the assets of a failed institution is against public policy, whether couched in terms of contributory negligence, proximate cause, or mitigation of damages."); *FDIC v. Mahajan*, No. 11-cv-07590, 2013 WL 505167 (N.D. Ill. Feb. 12, 2013); *RTC v. Gravee*, No. 94 C 4589, 1995 WL 599056, at *3-4 (N.D. Ill. Oct. 5, 1995) (striking affirmative defenses based on post-receivership conduct due to absence of duty from receiver to directors and officers of failed bank); *FDIC v. Greenwood*, 719 F. Supp. 749, 750-51 (C.D. Ill. 1989) (finding that public policy concerns mandate that evidence related to the FDIC's decisions as receiver with respect to the sale of bank's assets was immaterial); *FDIC v. Carlson*, 698 F. Supp. 178 (D. Minn. 1988); *FSLIC v. Burdette*, 718 F. Supp. 649 (E.D. Tenn. 1988); *FDIC v. Renda*, 692 F. Supp. 128, 135-36 (D. Kan. 1988).

---

[3] The no duty rule applies regardless of whether the defenses at issue challenge the disposition of the assets of the failed bank by FDIC as receiver, or by FDIC in its corporate capacity, which sometimes purchases the assets of the failed bank from the receiver. For example, in adopting the no duty-to-mitigate rule that was first established with respect to FDIC as receiver, the Seventh Circuit rejected "distinctions between the various capacities in which [FSLIC/FDIC/RTC] operates or the spheres of activity in which it has been engaged" for purposes of the no duty rule. *Bierman*, 2 F.3d at 1439.

As a practical matter, any supposed duty to mitigate is completely inconsistent with FDIC-R's statutory value maximization objectives.  FIRREA does not require FDIC-R to maximize recoveries on each individual asset, such as the eleven Transactions at issue in this litigation. The statute only requires FDIC-Receiver to maximize overall recoveries *in a particular receivership*.  What price is better for the part (the Transactions grossly negligently approved by Defendants) is not necessarily better for the whole (the entire receivership).  FDIC-R may be able to obtain the best price only by bundling the assets in question with non-performing assets that it could not sell otherwise, and discounting them.  Imposing a duty to mitigate losses on individual loans and assets would interfere with the FDIC-R's ability to bundle loans and to otherwise effectuate the purchase and assumption transactions that have helped safeguard the stability of the banking system for decades.

Defendants are entitled to know the damages claimed by FDIC-R and the basis for calculating them.  FDIC-R has agreed to produce documents sufficient to establish and prove how the loss for each Transaction is calculated.  However, Defendants are not entitled to challenge FDIC-R's decision making in its efforts to mitigate its damages.  Therefore, Defendants' requests for every single document created post-receivership that in any way refers to the eleven Transactions and their collateral is necessarily overly broad, unduly burdensome, and not reasonably calculated to the discovery of admissible evidence.

In addition, the Requests that seeks "all documents that constitute, discuss, or refer to" or relate in any way to post-Receivership loan and collateral dispositions and loss and damages calculations necessarily seek the production of attorney-client communications and work-product.  For example, documents prepared by or at the direction of FDIC-R in-house and

outside counsel relating to damages are responsive to these types of Requests.   Defendants are

not entitled to these privileged documents.   Closing reports and other communications prepared

by investigators for FDIC counsel are attorney-client privileged communications and therefore

are protected from production.  *FDIC v. Cherry, Bekaert & Holland*, 131 F.R.D. 596, 599-99

(M.D. Fla. 1990); *FDIC v. Butcher*, 116 F.R.D. 203, 204 (E.D. Tenn. 1987) (FDIC memoranda

to counsel discussing loans at issue were privileged).

      Finally, to the extent damages calculations will be subject to expert testimony (Request

21), such opinions will be disclosed in due course prior to the expert disclosure deadline.

      **B.**     **Defendants' impermissibly seek all Bank documents, without time limits.**

      The eleven Transactions at issue were approved by Defendants during a 22 month

window from November 1, 2005 through August 14, 2007.  *See* Am. Compl., Ex. A.  Since the

relevant time period for discovery in this case is tethered to these Transactions, FDIC-R has

agreed to produce documents dating from 2002 – three years before the first Transaction was

approved – through the date of the Bank's failure.[4]

      Defendants would not accept these limitations, and instead unjustifiably seek documents

from throughout the *Bank's 26 year history* relating to every transaction or loan the Bank ever

made, including, for instance, all minutes of every meeting that the Bank ever had (Request No.

12) and all documents relating to any of the Bank's commercial or real estate lending programs,

past and present and regardless of any connection to the Transactions (Request No. 20).

Defendants' requested discovery is patently overbroad, because documents unrelated to the

eleven Transactions (such as those outside the relevant time period) are unlikely to constitute

---

[4] FDIC-R originally objected to the production of documents from prior to 2005.  *See* Mot. to Compel,
Ex. B, General Objection 6.   In an attempt to compromise with Defendants, FDIC-R later agreed to
produce documents from as far back as 2002.

admissible evidence, nor are they reasonably calculated to lead to admissible evidence.

Defendants argue that they should be able to "show that they managed the Bank in a safe and sound manner over a lengthy period of time" prior to the Transactions.  *See* Mot.to Compel at 12.  But the fact that Defendants may have complied with their duty of care to the Bank in the past does not make every single Bank document relevant to the "claims and defenses" in *this* case, which relate to certain risky and highly speculative Transactions approved from 2005 to 2007.  Defendants cannot obtain discovery which is calculated solely to support irrelevant and inadmissible arguments or which is unduly burdensome.

### C.    Documents identified in FDIC-R's Rule 26(a)(1) disclosures (Request 1).

Defendants request "All documents that constitute, discuss, or refer to any documents identified in your disclosures pursuant to Rule 26(a)(1). . . ."  Defendants' Motion to Compel on this matter is moot because FDIC-R has agreed to produce all such documents.

### D.    FDIC-R has agreed to produce documents relating to the subject Transactions and other relevant issues created prior to receivership .

**Request 2**: All documents that constitute, discuss, or refer to the Transactions, including but not limited to the loan files, loan applications, underwriting worksheets, financial statements, guarantees, . . .  loan modifications, loan dispositions, and loss calculations.

**Request 3**: All documents that constitute, discuss, or refer to communications by, between, and/or among any officers, directors and/or employees of the Bank referring to the Transactions.

**Request 12**: All documents that constitute, discuss, or refer to the minutes of any meetings of the Bank's board of directors, directors' loan committee, . . . , and ALCO committee from 2002 until the date of the Bank's closure.

**Request 13**: All documents that constitute, discuss, or refer to the charters of the Bank's board of directors and any committee.

**Request 14**: All documents that constitute, discuss, or refer to the Bank's Loan Policies, Appraisal Policies, . . . in effect at any time from 2002 until the date of the Bank's closure.

18

**Request 16**: All documents that constitute, discuss, or refer to any audits or examinations of the Bank or any of its financial statements by independent auditors from 2002 until the date of the Bank's closure.

**Request 17**: All documents that constitute, discuss, or refer to business plans and financial projections of the Bank, including but not limited to any plans and projections from the charter and deposit insurance applications from 2002 until the date of the Bank's closure.

**Request 20:** All documents that constitute, discuss, or refer to the Bank's commercial and/or real estate lending programs, including but not limited to any policies and procedures relating to the origination and underwriting of residential, construction, or land-development loans.

**Request 23**: Any documents that constitute, discuss, or refer to personal financial benefits, if any, that were improperly or unlawfully obtained by the directors or officers of the Bank or any of the Defendants.

Defendants request documents that relate in any way to the Transactions, no matter how tangentially. Defendants also request documents that relate to other issues relating to the operations of the Bank. As the FDIC-R written responses to these Requests make clear, FDIC-R has agreed to produce documents in response to virtually all such requests to the extent that they relate to the relevant time period, are not privileged, and do not relate to post-receivership disposition of the Transactions or collateral. Thus, Defendants have mischaracterized FDIC-R's position with respect to discovery. FDIC-R has offered to produce all of these documents through two-phase discovery, subject only to entry of an agreed confidentiality order.

> **E.    FDIC-R has agreed to produce regulatory materials from the Bank files that are in FDIC-R's possession, custody, and control.**

**Request 8**: All documents that constitute, discuss, or refer to any examination, review, visit, or evaluation of the Bank or any of the Transactions at issue by a Governmental Authority occurring from 2002 until the date of the Bank's closure, including but not limited to any notes, work-papers, memoranda, correspondence and reports.

**Request 9**: All documents that constitute, discuss, or refer to any communication between and/or among the examiner-in-charge, regional or field office, district office, and/or Washington D.C. office of any Governmental Authority referring to the Bank or

any of the Defendants.

**Request 10**: All documents that constitute, discuss, or refer to any memorandum of understanding, written agreement, consent resolutions, or other nonpublic action, agreement or understanding by and/or between the Bank, its board of directors, and/or any of the Defendants and any Governmental Authority.

**Request 11**: All documents that constitute, discuss, or refer to any notice of intent, order to cease and desist, prompt corrective action directive, notice of charges, or any other communication evidencing the commencement of or an intent to commence an administrative, civil, or criminal action or proceeding by a Governmental Authority against the Bank or any of the Defendants.

**Request 21**: All documents that constitute, discuss, or refer to expert and consultant opinions or reports on real estate lending in Florida provided to or obtained by the FDIC for any period of time between 2002 and 2012, including but not limited to any analysis of residential, construction, or land-development lending patterns or policies of peer financial institutions.

**Request 22**: Any documents that constitute, discuss, or refer to communications between any Governmental Authority and the Bank or any of the Defendants that warned of potential weaknesses or price fluctuations in the commercial or residential real estate markets in Florida or the United States between 2002 and closure of the Bank, including but not limited to any communications suggesting or mandating more stringent loan underwritings, reductions in concentrations in real estate loans, reduced loan-to-value ratios, higher capitalization, or increased liquidity.

**Request 25**: All documents that constitute, discuss, or refer to the personnel of any Governmental Authority participating in the regulatory supervision of the Bank from 2002 until the date of the Bank's closure.

**Request 27**: All documents that constitute, discuss, or refer to agreements or understandings between any Governmental Authority and any former officer or director of the Bank.

Defendants have requested all documents that in any way refer to or discuss regulatory examinations or review of the Bank prior to its closing and the appointment of the FDIC as receiver.  As is clear from FDIC-R's written responses, it has agreed to produce regulatory RoEs, correspondence, memorandum, and related documents from the Bank files that are in FDIC-R's possession and that are within the relevant time period.  FDIC-R agrees that such

documents are relevant to FDIC-R's allegations that Defendants failed to heed regulatory warnings.  Defendants repeated argument that FDIC-R is attempting to withhold such documents is completely baseless.[5]

However, Requests 9, 21, and 27, are objectionable because they seek regulatory documents and materials created after the closure of the Bank.  All such documents have nothing to do with the approval of the Transactions approved by Defendants between 2005 and 2007.  Moreover, such documents are irrelevant because the conduct of the regulators after the closure of the bank cannot be the basis for a defense.  *See supra* at 14-16.  In addition, the regulatory investigation of the Bank is confidential under 12 C.F.R. § 308.147, *et. seq.*, and Defendants do not contend otherwise.  Finally, these requests necessarily seek the attorney-client communications and work product of FDIC in-house counsel and investigators and FDIC-R's outside counsel.  *Supra* 16-17; *infra* Sec. F.  Defendants do not contend otherwise.

### F.      Requests for documents relating to FDIC-R investigations.

**Request 18**: All documents that constitute, discuss, or refer to any statements, interview notes, and/or transcripts of testimony provided to or obtained by the FDIC that refer to the Bank, the Defendants, or the Transactions at issue.

**Request 19**: All documents that constitute, discuss, or refer to a Preliminary Findings Report and/or any other reports of investigations made, prepared, or obtained by the FDIC referring to the Bank, including but not limited to any reports referring to the Bank's failure.

**Request 24**: All documents that constitute, discuss, or refer to the Safety and Soundness: Material Loss Review of Peoples First Community Bank (01 G-l1-094) by the Office of Inspector General, Department of the Treasury, dated August 25, 2011, including but not limited to documents reviewed or available for review and all work papers generated in

---

[5]    FDIC-R does contend that such documents are irrelevant to the conduct of the regulators because, under the "no-duty rule," Defendants cannot assert the contributory negligence of the regulators as a defense as a matter of law.  *See* General Objections 4 and 5.  However, it is not withholding pre-receivership regulatory documents based on the pre-receivership no duty rule to the extent such documents reflect warnings and criticisms FDIC-R alleges Defendants ignored or disregarded.

preparation of any such report.

Defendants contend that information responsive to these Requests is relevant because "Defendants are entitled to discovery as to why the Bank was closed." However, this case is not about why the Bank closed. FDIC-R's claims are narrowly limited to the Defendants' negligent and grossly negligent approval of eleven Transactions prior to the closure of the Bank. FDIC-R does not seek damages flowing from the closure of the Bank, only those flowing from the eleven Transactions approved by Defendants.

Moreover, the interview notes and summaries Defendants seek in Request 18 are all attorney-client privileged communications, because they are substantive communications from FDIC-R investigators to FDIC-R counsel in which the investigators seek and otherwise discuss legal advice. Likewise, the reports of investigations sought by Defendants in Request 19 are protected by the attorney-client privilege.

Closing reports and other communications prepared by investigators for FDIC counsel are attorney-client privileged communications and therefore are protected from compelled production. *Cherry, Bekaert & Holland*, 131 F.R.D. at 599. In *Cherry*, the FDIC objected to producing its loan "writeups" and post-closing reports on the basis of attorney-client privilege, and defendant filed a motion to compel production of these documents. *Id.* at 598. The district court denied this motion, finding that these documents were attorney-client privileged. *Id.* at 602-603, *see also FDIC v. Butcher*, 116 F.R.D. 203, 204 (E.D. Tenn. 1987) (FDIC memoranda to its counsel discussing various loans at issue were privileged).

Request 24 for "all documents" that are in any way related to the Bank's Safety and Soundness: Material Loss Review performed by the Office of the Inspector General ("OIG") is

also irrelevant.  The Material Loss Review is publicly available to Defendants.  However, it relates generally to the reasons that the Bank failed, and does not address any of the particular Transactions at issue, and is therefore irrelevant.  Moreover, documents "relating" to the Material Loss review, in its broadest sense include the OIG work papers and other investigatory materials that are confidential and not within the possession, custody, or control of the FDIC-R. As drafted this Request also includes the attorney client communications and work product of FDIC-R and of its outside counsel.

G.   **Requests that seek attorney work product.**

**Request 28**: All documents that constitute, discuss, or refer to the "transaction presentations," including . . . alleged "glaring deficiencies" therein. (Compl. ¶¶ 3, 4.)

**Request 29**: All documents that constitute, discuss, or refer to the Defendants' alleged failure "to inform themselves adequately of the relevant risks in connection with their approval of credit transactions." (Compl. ¶ 3.)

**Request 30**: All documents that constitute, discuss, or refer to the "underwriting and transaction administration," . . . or "underwriting and credit administration policies and practices to manage the risks" of the Transactions at issue, including any alleged deficiencies or inadequacies therein, or Defendants' alleged lack of adherence thereto, or any other alleged "violations of the Bank's policies." (Compl. ¶¶ 3, 23, 25-26, 28-30.)

In these Requests (which are raised specifically in Defendants' Motion to Compel), and the 64 Requests that follow (which are generally referred to in Defendants' Motion to Compel) Defendants quote nearly every paragraph of FDIC-R's Complaint and seek to have FDIC-R categorize the entire universe of documents that "constitute, discuss, or refer to" every factual and legal contention in the Complaint.

FDIC-R will produce all documents within its possession, custody, or control, that it contends support the factual allegations in the Complaint.  However, in each of Defendants' Requests 28 through 94, Defendants ask for all documents which support a particular legal or

23

factual proposition from FDIC-R's Complaint.  Defendants are attempting to have FDIC-R and its counsel catalogue what it deems relevant and important to its case.  Thus, Defendants improperly seek opinion work-product in the form of FDIC-R counsel's "selection and compilation of documents" for each issue in this litigation.  *Sporck v. Peil*, 759 F. 2d 312, 316 (3d. Cir. 1985).  Where, as here, there is a real concern that "the thought processes of counsel in relation to pending or anticipated litigation would be exposed" by a particular production, the opinion work-product doctrine applies, and the production need not be compelled.  *Cf. Hunter's Ridge Golf Co., Inc. v. Georgia-Pacific Corp.*, 233 F.R.D. 678, 681 (M.D. Fla. 2006) (discussing selection and compilation doctrine; court ultimately compelled production because subject requests were "not directed at learning what counsel . . . deems relevant or important").  In this instance, while Defendants may request the documents which support FDIC-R's claims (which FDIC-R has agreed to produce), Defendants cannot compel FDIC-R counsel's categorization and "selective review" of documents into 66 separate categories based upon counsel's "professional judgment of the issues and defenses" involved in this case.  *Shelton v. American Motors Corp.*, 805 F. 2d 1323, 1329 (8th Cir. 1986).

## V.   SANCTIONS ARE NOT WARRANTED.

Defendants request their expenses, including attorney's fees, incurred in filing their Motion.  However, Rule 37(a)(5)(A) provides, however, that "the court **must not** order [payment of expenses] if . . .  the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." *Id.* at (ii) and (iii).   FDIC-R's responses and objections are substantially justified, and under the circumstances, an award of expenses would be unjust.

The discovery disputes are essentially over the manner of conducting discovery.  FDIC-R possesses relevant documents in its database, and ultimately agrees that Defendants are entitled to inspect and copy these documents.  FDIC-R has already agreed to produce a large amount of the most relevant documents to Defendants.  Additionally, Defendants requested an enormous amount of materials from FDIC-R's database, which spans literally millions of documents that FDIC-R obtained only after the Bank closed.  FDIC-R is justified in seeking the entry of an appropriate agreed confidentiality order and a protocol on the production of ESI in order to minimize the costs and risks of production for all parties.

There has been no inaction or dilatory conduct on FDIC-R's part with respect to discovery.  Counsel for FDIC-R has engaged in regular communications with opposing counsel, and FDIC-R has repeatedly attempted to obtain an agreement on the production of relevant information.  Despite these efforts, the parties reached an impasse with regard to discovery.  No sanctions are warranted.

## VI.    CONCLUSION

For the foregoing reasons, FDIC-R requests that the Court enter an order: (1) denying Defendants' Motion to Compel; (2) approving the Protocol attached hereto as Exhibit B; (3) sustain FDIC-R's objection to the document Requests; (4) deny Defendants' request for sanctions.

**Dated: June 7, 2013**     Respectfully submitted, by:

            /s/ Joseph G. Galardi
            Joseph G. Galardi
            galardi@beasleylaw.net
            Florida Bar No. 180572
            Andrew S. Kwan
            Florida Bar No. 76539
            BEASELY HAUSER KRAMER
            & GALARDI, P.A.
            505 South Flagler Drive, Suite 1500
            West Palm Beach, Florida 33401
            Tel:  (561) 835-0900
            Fax: (561) 835-0939

## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that on this 7th day of June, 2013, this document was electronically filed with the Clerk of this Court by using the CM/ECF system, which will serve a copy on all counsel of record.

          s/ Joseph G. Galardi
           Joseph G. Galardi